UNITED STATES *v.* ROTBERG & KRIEGER (No. 3989)[1]

United States Court of Customs and Patent Appeals, March 22, 1937

*Joseph R. Jackson,* Assistant Attorney General (*Marcus Higginbotham, Jr.,* special attorney, of counsel), for the United States.

*Barnes, Richardson & Halstead* (*Albert Mac C. Barnes* and *Samuel M. Richardson,* of counsel) for appellee.

[1] T. D. 48902.

442

[Oral argument February 8, 1937, by Mr. Jackson and Mr. Albert Mac C. Barnes]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, holding certain dogskins, imported from China under the Tariff Act of 1930, entitled to free entry.

The merchandise was classified by the collector and duty assessed under paragraph 1519 (a) of the act, which reads:

Dressed furs and dressed fur skins (except silver or black fox), and plates, mats, linings, strips, and crosses of dressed dog, goat, or kid skins, 25 per centum ad valorem; * * *.

The claims embraced in the protest of the importer are:

1. That the merchandise is free of duty either under paragraph 1681, reading, "Furs and fur skins, not specially provided for, undressed", or under paragraph 1765, reading, "Skins of all kinds, raw, and hides not specially provided for."

2. That, if dutiable, it is dutiable at either 10 per centum or 20 per centum ad valorem under paragraph 1558, which reads:

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

An unusual situation is presented in the decision of the trial court. Only two of the three judges composing the division participated in the decision and those two disagreed as to the paragraph applicable. Sullivan, J., who wrote one opinion, held the merchandise to be classifiable under paragraph 1681 and so duty free. Brown J., who wrote another, held it to be classifiable under paragraph 1765 and so duty free. The pertinent part of the formal judgment, however, is that it "is properly free of duty under paragraph 1681 of the Tariff Act of 1930", and we shall, of course, treat the case upon the basis of the judgment.

It seems proper to say at the outset that merchandise seemingly of the kind here involved was involved in two cases brought to this court where classification under the Tariff Act of 1922 was at issue. *United States* v. *M. Bernstein & Sons*, 19 C. C. P. A. (Customs) 59, T. D. 44895 (opinion on rehearing, 19 C. C. P. A. (Customs) 242, T. D. 45340); *Arnhold & Co., Inc.* v. *United States*, 22 C. C. P. A. (Customs) 23, T. D. 47036. Those cases, while arising under the 1922 act, did not reach this court until after the passage of the 1930 act. In the *Bernstein & Sons* case, *supra*, the claim relied upon by the importer was that the merchandise was classifiable by similitude to plates or mats of dogskins. Upon the record there presented, the

majority of this court denied the claim and, finding the merchandise to be furs dressed on the skin, within the meaning of paragraph 1420 of the 1922 tariff act, sustained the collector's classification thereunder. In the *Arnhold & Co.* case, *supra,* the importer claimed classification by similitude, and also claimed free entry under paragraph 1579 of the act, prototype of paragraph 1681, *supra.* There was also a claim of free entry (not, however, seriously pressed) under paragraph 1666 of the act, prototype of paragraph 1765, *supra.* Upon the record there presented, this court unanimously held that the merchandise was shown to be neither "furs dressed on the skin" nor "fur and fur skins * * * undressed"; that they were "partly" dressed, and did not fall definitely within the proper meaning, either commercial or common, of either "dressed" or "undressed", but were classifiable by similitude to plates and mats of dogskins provided for in paragraph 1420 of the 1922 act. In neither of those cases was any claim urged for classification of the merchandise either as "unmanufactured articles not enumerated or provided for" or as "articles manufactured, in whole or in part, not specially provided for" and we had no occasion there to consider the applicability of paragraph 1459 of the 1922 act, prototype of paragraph 1558, *supra.*

Paragraph 1519 (subparagraph (a) of which is quoted, *supra*) of the Tariff Act of 1930 corresponds to paragraph 1420 of the Tariff Act of 1922, but there is a material difference in language. The 1930 act reads, "plates, mats * * * of *dressed* dog * * * skins" [italics ours], while the 1922 act reads "plates and mats of dog * * * skins", the qualifying word "dressed" not being used. Also the duty rate on plates and mats of *dressed* dogskins in the 1930 act is the same as that provided for *dressed* furs and *dressed* fur skins (25 per centum ad valorem), while in the 1922 act the rate on furs dressed on the skin was 25 per centum ad valorem and that on plates and mats of dogskins was only 10 per centum ad valorem. Naturally, there is no claim here by the importer for classification by similitude to plates and mats of *dressed* dogskins. Such a claim would be wholly inconsistent with importer's contention that the articles are furs or fur skins undressed. If they are dressed they are dressed furs or dressed fur skins, and so *eo nomine* provided for. If they are undressed, or only "partly" dressed, obviously they cannot be classified by similitude to *dressed* mats or plates. So, there is no place here for application of the similitude rule.

In the *Bernstein & Sons* case, *supra,* it was held, following the rule stated in the case of *Transport Co.* v. *United States,* 15 Ct. Cust. Appls. 89, T. D. 42159 (involving kid skins), and authorities therein cited and reviewed, that proof as to the skins there at issue being excluded by commercial designation from "furs" or "furs dressed on the skin" was immaterial, and that they must be regarded as such. This ruling was

followed in the *Arnhold & Co.* case, *supra*, where it was said, in effect, that this eliminated the applicability of the paragraph (paragraph 1666, prototype of paragraph 1765, *supra*) providing for "skins of all kinds, raw, \* \* \*." It was held, however, in the *Arnhold & Co.* case, *supra*, that testimony as to the commercial meaning of "dressed" and "undressed", treating the merchandise as furs, was proper, and our conclusion in the case was based strictly upon the evidence there presented.

Neither the *Bernstein & Sons* case, *supra*, nor the *Arnhold & Co.* case, *supra*, was referred to by the trial court in its decision in the instant case, nor is either referred to in the brief on behalf of appellee before us. The brief on behalf of the Government refers to both by way of argument upon certain of its contentions, but we do not understand that counsel for either party regards either of those cases as controlling here.

It was made clear by us in both those cases that our respective decisions rested solely upon the evidence, and we agree that they are not controlling of the conclusion to be here reached, but it remains true that, under those authorities, the merchandise must be treated as furs.

In the leading opinion in the instant case, the trial court said, "The question is one of fact: Are they *'dressed* furs' or *'dressed* fur skins'?" The testimony was then reviewed in great detail and the conclusion was reached therefrom that "these dogskins \* \* \* are not classifiable as *'dressed* fur skins'."

Counsel for the Government insist, first, that the trial court erred in not finding the merchandise to be *dressed* fur skins such as are provided for *eo nomine* in paragraph 1519 (a), *supra*. Secondly, they insist that, if not classifiable and dutiable there, the articles should be classified as nonenumerated articles, manufactured in whole or in part, under paragraph 1558, *supra*.

Counsel for appellee, on the other hand, maintain that the skins are fur skins *undressed* within the meaning of paragraph 1681, *supra;* that such was the basic finding of fact by the trial court upon the evidence before it and that, under the well-established rule, this court will not reverse a finding of fact by the trial court unless it appear to be clearly against the weight of the evidence.

As to the alternative claims under paragraph 1558, *supra*, the brief for appellee argues against both, urging that, in its imported condition, the merchandise is not a manufactured article, and also that it is not a nonenumerated unmanufactured article. It is insisted that it is *enumerated* in the free list, either in paragraph 1681, *supra*, or in paragraph 1765, *supra*. Notwithstanding the adverse argument by appellee's counsel, however, there is no formal abandonment of the claims so alternatively made in the protest, and in the concluding

paragraph of the brief the "nonenumerated unmanufactured article" claim is specifically reiterated as an alternative, if the merchandise be not found free of duty as claimed.

We do not deem it necessary to review the testimony in detail. Eleven witnesses were called on behalf of the importer and six on behalf of the Government. The material testimony of each witness is summarized fully and fairly by Judge Sullivan in his opinion. Samples illustrative of the merchandise as imported were placed in evidence.

It must be remembered that the sole concern here is with the merchandise in its condition as imported. Four of the witnesses called on behalf of importer qualified as being familiar with that processing of the skins which takes place in China. According to this testimony, it seems that the skins are sometimes, possibly usually (but this is not of importance), taken from the animals in extreme cold weather and placed in piles where they are allowed to lie until the weather becomes warmer. The first process applied to the skins when treatment of them actually begins is to scrape off fat and remove dirt. They are then placed in the sun for drying. After being dried, they are placed in barrels or vats containing water with which there is mixed a flour, described as "dalyon flour," made from some kind of Chinese cereal. They remain in these barrels or vats for several days—one witness says, "perhaps six or seven days." They are then taken out and put in the sun for drying. After being dried, if any are in a very hardened condition such are returned to the barrel or vat, again soaked, and again dried in the sun. After being dried, the skins are packed in bales, 200 to 300 skins to the bale, by press packing machines, and thus exported.

So far as the record discloses, the foregoing constitutes the whole of the processing which takes place in China, and the primary question is, Does such processing render the skins dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra*?

Much of the brief on behalf of the Government is devoted to emphasizing parts of the testimony to the effect that the merchandise is referred to in China as "dressed" "dogskins", and it is said in the brief, "The Chinese dogskins here involved were described on Consular invoice No. 1414 as 'Tanned Mukden Dogskins' and were entered, Entry No. 706397, as 'Five Bales Tanned Dogskins (Dressed Furs Not Dyed)'."

We regard it as being of small consequence that the merchandise may have been referred to in China as dressed dogskins, nor is it of particular importance under what name or names the skins were ordered. The question of what they actually are must be determined by United States trade standards. *James F. White & Co.* v. *United States*, 23 C. C. P. A. (Customs) 224, T. D. 48061. Neither are the

notations on the consular invoice and the entry papers controlling if satisfactory evidence be presented by either party showing the statements to be erroneous. *United States* v. *Paul Puttman*, 21 C. C. P. A. (Customs) 135, T. D. 46466, and authorities there cited.

It is apparently the theory of the Government that the use of the flour in China is a step in a dressing process and that, as imported, the skins are dressed to a stage when they are ready for the dyer, and the opinions expressed by some of the Government's witnesses are to this effect. The trial court, however, considering the entire record and weighing all the testimony, reached a different conclusion.

It seems to us to be clear that had the flour not been used in China, the skins could not possibly have been regarded as dressed in the sense of the tariff act by the other processes which took place there. Therefore, the function of the flour seems of importance in determining the issue. The purport of the testimony given concerning its use is that it is for the purpose, not of dressing the skins, but, as one witness expressed it, "To preserve them and keep them in proper shape, to allow them to be shipped, so that they do not deteriorate while in transit; so that when they come to New York that they remain in such shape that they do not spoil." Another witness testified that if the skins were not processed as described "they would rot, and the hair would fall out." There is no contradiction of this testimony. It is true, and counsel for the Government base some argument upon the fact, that the Chinese processing seems to place the skins in condition whereby they continue in a state of preservation for a period much longer than is required for their transportation. One witness for importer testified that from his experience the process arrests decay for from four to five years. This may be true, but, as we view it, unless the processing in China was a treatment of the skins such as rendered them dressed in the sense of the tariff act, or partly dressed, the length of time it merely preserved them is not material. It is shown that in the processing which takes place after importation into this country, the flour or, as some of the witnesses designate it, the "powder", which has remained on or in the skins is washed out, or otherwise removed. This was shown not only by testimony offered on behalf of importer, but was stated quite positively by the Government's witness Price. Another witness, on behalf of the Government, was asked a number of questions concerning it, but his answers were so confused as to render his testimony of little aid upon this feature of the case. Certainly the great weight of the testimony concerning this point is that the flour is removed in the processing which takes place after importation.

The principal purpose for which the dogskins are ultimately used seems to be for making trimmings, and the like, for ladies' garments. Before they are ready for such use almost all of them must be dyed.

Before they are ready to be dyed, however, they require various processing steps. One Zechowy, a dyer, called as a witness on behalf of the importer, related as the steps which he applied in carrying the dogskins from the stage as imported to the stage where ready for dyeing the following, in substance: (1) Drumming the skins out in sawdust, (2) putting them into a vat or tank containing a secret chemical for tanning the leather, (3) wringing them out, (4) putting them into another tank containing "Logwood, sumac, turmeric, gambier", this being also a tanning bath. Incidentally, the witness stated that the first of these baths removes all the powder that appears in the skins. It is after these steps that the dyeing steps begin. With these we are not here concerned. According to the testimony, the dyeing processes seem frequently to continue immediately after the processes above related, and some of the dyeing steps are referred to as dressing, but the line of demarcation where other steps end and the dyeing steps begin seems quite clearly pointed out, not only by the testimony of the witness mentioned, but by that of others. For example, a witness, called on behalf of the Government, related the process of dressing up to the point where the skins are ready for dyeing, as carried out by him in the United States, beginning, not with skins in the condition of those at issue at the time of their importation, but with *raw* skins. His testimony is summarized in the opinion of Judge Sullivan as follows:

It consisted of scraping off the fat with a dull knife; immersing in water overnight, then applying salt water to the leather; placed in a pickle of oil, vitriol, salt, and alum; drying the skin; drumming with damp sawdust; greasing the skin; placing it in a kicking machine; placed in dry sawdust; cleaning with a knife; wetting it, with soap water; fleshed in a machine; dried; greasing the leather; placing it in the kicking machine; then in dry sawdust; pulling it again on a dull knife; drumming the skin; beating up the skin; combing out the hair; placing in the drum again to finish up the leather and clean out the hair in the leather; beating up the skin; stretching it out; and then sending it to the shipping room to be sent to the dyer. The witness then stated that the skin in its final condition is "completely dressed" for the dyer."

It will be noted that no flour was used in carrying out the process in the United States and it is somewhat difficult to point to the particular step, if any there be, which corresponds to the step of using the flour in China. In point of order, it would seem to be that of "applying salt water." Since the process described was a continuous one, all taking place, as we understand the testimony, in one plant, and running from the raw skin to the skin dressed to the stage where it was ready for the dyer, there was no occasion to utilize any ingredient for preparing the merchandise for transportation.

There is no question of commercial designation as distinguished from common meaning, presented in the case, and it is for the courts to determine from the record what the merchandise was in its im-

ported condition. Upon the authorities cited, *supra*, it must, we think, be treated as furs. As has been stated, merchandise seemingly similar to that here at issue was held, upon the testimonial record made up in the *Arnhold & Co.* case, *supra*, to be neither "dressed" nor *undressed*, but *partly* dressed. Even were such finding made here there could not be a classification by similitude for the reasons already given, but here we have a different testimonial record, and we think it here has been established (as it was not there established) that the treatment given the merchandise in China, including, of course, the use of the flour, did not constitute a dressing process, and that the merchandise in the condition as imported was not dressed furs or dressed fur skins within the meaning of paragraph 1519 (a), *supra*. Further, we think that the merchandise, being undressed furs, is enumerated and hence there is no place for the application of either provision of paragraph 1558, *supra*. Certainly "Furs and fur skins * * * undressed" is an enumeration and is more specific than either "raw or unmanufactured articles," or "articles manufactured, in whole or in part." Upon the record presented, we agree with the holding below that the merchandise should have been classified under paragraph 1681, *supra*.

Accordingly, the judgment of the United States Customs Court is *affirmed*.